**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

KENNETH WEBB,                                              Case No. 1:12-cv-984

            Plaintiff,                                 Weber, J.
                                                          Bowman, M.J.
     v.

COMMISSIONER OF SOCIAL SECURITY,

            Defendant.

**REPORT AND RECOMMENDATION**

      Plaintiff Kenneth Webb filed this Social Security appeal in order to challenge the Defendant's finding that he is not disabled.  *See* 42 U.S.C. §405(g).  Plaintiff presents multiple claims, all of which the Defendant disputes.  Because it is not supported by substantial evidence in the administrative record, the undersigned recommends that the Commissioner's decision be REVERSED.

     **I.**      **Summary of Administrative Record**

      In August 14, 2009, Plaintiff applied for disability insurance benefits ("DIB"), alleging a disability onset date beginning the day before his application, August 13, 2009.  Plaintiff last worked as an insulator for eight years, but was laid off just before filing his claim. (Tr. 36).   Plaintiff's application was denied initially and on reconsideration.

      Plaintiff obtained counsel in 2010 and requested a hearing de novo before an Administrative Law Judge ("ALJ"), arguing in part that he met or equaled Listing 12.05C. (Tr. 87).  On June 1, 2011, ALJ John Pope conducted an evidentiary hearing at which

he heard testimony from Plaintiff, from Plaintiff's wife, and from a vocational expert. (Tr. 30-67).   On September 13, 2011, the ALJ issued a written decision in which he determined that Plaintiff was not disabled during the relevant time period.  (Tr. 11-23).  The Appeals Council denied Plaintiff's request for further review, leaving the ALJ's decision as the Defendant's final decision.

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date, and that he has the following severe impairments: "Depression, Borderline Intellectual Functioning, degenerative disc disease, obesity, hypertension, diabetes mellitus, and sleep apnea." (Tr. 13).  However, none of those impairments or combination thereof met or medically equaled any listed impairment in 20 C.F.R. Part 404, Subpart P, Appx. 1.  (Tr. 13).  Plaintiff was 47 years old on his alleged disability onset date, and still in the "younger individual" age category by the date of the ALJ's decision, with a high school education.  (Tr. 22).

Considering the record as a whole, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a range of light work

> except he is limited to unskilled work and he may only frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, and he may never climb ladders, ropes, or scaffolds

(Tr. 15).  Based both upon Plaintiff's "light" work RFC and testimony from the vocational expert ("VE"), the ALJ found that Plaintiff cannot perform his past relevant work because two of his jobs (forklift operator and insulator) were semi-skilled at the medium exertional level, and a third unskilled job (sawmill operator) was at the heavy exertional level.  (Tr. 22).  However, the ALJ determined that Plaintiff remains able to perform other unskilled light and sedentary jobs that exist in significant numbers in the national

2

economy, including the representative jobs of assembler, inspector, press operator, and machine operator. (Tr. 22). Therefore, the ALJ held that Plaintiff was not disabled. (Tr. 23).

Plaintiff's Statement of Errors loosely catalogues six errors, but includes additional claims. In general terms, Plaintiff alleges that the Commissioner erred by: (1) failing to find he meets Listing 12.05(B) for mental retardation; (2) failing to find he meets Listing 12.02(A) for organic mental disorders; (3) failing to consider the side effects of Plaintiff's pain medications in determining his credibility; (4) failing to consider the same side effects in formulating the hypothetical question to the vocational expert; (5) failing to consider the combination of his impairments; and (6) failing to fully consider obesity. Although most of Plaintiff's assertions of error are without merit, a portion of Plaintiff's fifth claim requires remand.

.    **II. Analysis**

    **A. Judicial Standard of Review**

To be eligible for benefits, a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported

3

by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. . .. The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.   If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.*  (citations omitted).

In considering an application for either DIB or SSI, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national

economy.  *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

### B.  Plaintiff's Claims

Plaintiff uses a shotgun approach in chronicling alleged errors, including some seemingly unrelated claims within six broad categories.  As previously stated, the undersigned finds most of the asserted errors to be without merit.  In the interest of clarity, I begin with the discussion of the single error that requires remand.

### 1.  Reversible Error Concerning Mental RFC

Contained within Plaintiff's more general fifth claim is an argument that the RFC failed to include any limitation on concentration, persistence and pace.  In addition to a discredited pain doctor whose disability opinion was properly rejected, several agency consulting physicians opined that Plaintiff would have "moderate" limitations of concentration, persistence and pace." (Tr. 465, 479). In fact, the ALJ agreed that Plaintiff would have such limitations,[1] (Tr. 14), but failed to include any mental limitations in the hypothetical RFC posed to the vocational expert, or in his written opinion.

The Defendant argues that the limitations are inherently encompassed by the general restriction to "unskilled" work.  Consultant Dr. Waggoner found that despite "moderate difficulties in concentration, persistence or pace," Plaintiff would have "no significant difficulties with work limited to the completion of simple and routine tasks." (Tr. 482).

---

[1]It is unclear, but unnecessary to determine, whether this functional limitation results from Plaintiff's relatively low IQ or from some other cause.

Unfortunately for Defendant, the limitation to unskilled work does not adequately factor in "moderate" limitations in concentration, persistence or pace.  The failure to include any mental limitations is not supported by substantial evidence, thereby rendering the VE's testimony insufficient to uphold the decision.  *See generally Ealy v. Comm'r*, 584 F.3d 504, 516 (6th Cir. 2010)(where medical source opinions specifically limited Plaintiff's ability to sustain attention and imposed restrictions in pace, speed and concentration, ALJ's "streamlined" hypothetical omitting those restrictions was insufficient); *Edwards v. Barnhart*, 383 F. Supp.2d 920, 930-931 (E.D. Mich. 2005)(hypothetical limiting claimant to "jobs entailing no more than simple, routine, unskilled work" not adequate to convey moderate limitation in ability to concentrate, persist, and keep pace).

In the absence of such limitations, the VE testified that Plaintiff would be required to concentrate "90 percent of the time."  (Tr. 65).  Even though the VE testified that Plaintiff could perform a fairly large number of positions (approximately 40,000), the record does not permit this Court to simply assume that a sufficient number of those positions could be performed with Plaintiff's "moderate" limitations. Plaintiff asserts that the representative jobs identified by the VE arguably would conflict with his mental limitations.  *See e.g., Edwards v. Barnhart*, 383 F. Supp.2d at 931 (noting that job of packer "seems to require a degree of sustained degree of concentration, persistence and pace.").  For this reason alone, remand is required.  As discussed in the remainder of this Report and Recommendation, I find no other reversible error.

### 2. Listing 12.05B

Plaintiff argues that the ALJ should have found him disabled for mental retardation, based on evidence that he was enrolled in special education classes and appears to have scored a "58" on a recent IQ test. Listing 12.05B states:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports on onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> ....B. A valid verbal, performance, or full scale IQ of 59 or less....

*See* 20 C.F.R. Part 404, Subpart P, Appendix 1, §12.05B.[1]

The ALJ expressly considered all categories of mental retardation but held that Plaintiff's mental impairments did not meet or medically equal the criteria. (Tr. 14-15). Both Listing 12.05C and Listing 12.05D require a valid IQ score of "60 through 70" plus an extra element. Listing 12.05B, with its substantially lower IQ prerequisite of "59 or less" does not require additional restrictions, other than proof of subaverage intellectual functioning and "deficits in adaptive functioning" manifested prior to the age of 22. As discussed below, the ALJ clearly found no deficits that would meet or equal any portion of Listing 12.05.

In addition, for purposes of the extra criteria required for Listing 12.05D, the ALJ explained that Plaintiff was unable to show that he had at least two "marked" restrictions in activities of daily living, maintaining social functioning, maintaining concentration,

---

[1]Listing 12.05B is the listing category for those with the lowest IQ test scores, who are most often classified within the "moderate," "severe," or "profound" categories of mental retardation. Plaintiff's score of 58 would place him within the "moderate" category. By contrast, subparagraphs C and D both focus on the generally higher-functioning category of "mild" mental retardation.

persistence, or pace, or one such "marked" impairment plus "repeated episodes of decompensation, each of extended duration." (Tr. 14). The ALJ found only "mild" restrictions of daily living and social functioning, only "moderate" difficulties with regard to concentration, persistence or pace, and no episodes of decompensation. (Tr. 14).[2]

For purposes of Listing 12.05B, the ALJ further stated: "Although the claimant had a full-scale IQ score of 58 on the WAIS-IV administered during the psychological consultative examination (Exhibit 5F), that score was not consistent with the claimant's actual functioning, which the examiner found to be in the borderline range, and was not consistent with his previous testing, where the claimant had an IQ score of 78 (Exhibit 23F)." (Tr. 15, citing Tr. 672). The ALJ explained:

> [T]the requirements in paragraph A are met when there is mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded. In this case, these requirements are not met because the claimant testified that he is able to dress, groom, and bathe himself, and he is able to prepare simple meals."
>
> As for the "paragraph B" criteria, they are not met because the claimant does not have a valid verbal, performance, or full scale IQ of 59 or less with deficits in adaptive functioning. Although the claimant had a full-scale IQ score of 58 on the WAIS-IV administered during the psychological consultative examination (Exhibit 5F), that score was not consistent with the claimant's actual functioning, which the examiner found to be in the borderline range, and was not consistent with his previous testing, where the claimant had an IQ score of 78....

(Tr. 15).

Having addressed why Plaintiff could not meet the particular requirements of Listing 12.05B or Listing 12.05D, the ALJ concluded by stating that "the "paragraph C" criteria of listing 12.05 are not met because the claimant does not have a valid ...IQ

---

[2]For most mental health listings, these are generally known as the "Paragraph B" criteria. In his brief to the Appeals Counsel, Plaintiff conceded that "there are no 'B' criteria." (Tr. 207).

score of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  (*Id.*).

At the administrative level, Plaintiff focused on Listing 12.05C, but he now focuses on his allegedly qualifying IQ score under Listing 12.05B.  Plaintiff protests that neither Dr. Virgil, the consultant who administered the IQ test, nor the consultant who reviewed his mental health records, questioned the validity of his IQ score for purposes of Listing 12.05.  But that is not entirely correct.

Importantly for purposes of Plaintiff's claim, Dr. Virgil considered whether Plaintiff met criteria for mental retardation – the same criteria required by Listing 12.05 - by reviewing his adaptive functioning.  Despite reporting a numeric score in the "moderate" range of mental retardation, which he curiously described as in the "mild" range,[3] Dr. Virgil diagnosed Plaintiff to have only "borderline intellectual functioning." He concluded that Plaintiff was not even mildly mentally retarded, based upon Plaintiff's lack of deficits in adaptive functioning. (Tr. 401).  As Defendant points out, although Dr. Virgil referenced Plaintiff's educational history (Tr. 398), his report does not reference Plaintiff's prior IQ results, suggesting that he may not have had access to those records.

Dr. Waggoner, the reviewing consultant, more directly challenged the validity of the recent IQ score, and concluded that the score was not valid.  Dr. Waggoner reasoned that the score was 20 pounds lower than the prior IQ test, and there was no evidence of an intervening traumatic brain injury or other neurological process that could account for such a drastic change.  (Tr. 482).  Therefore, she concluded that

---

[3]"Mild" retardation is generally defined as the IQ range from 60 through 70.  The discrepancy in Dr. Virgil's report causes the undersigned to question whether the full scale IQ score of "58" was intended to be a "68" but for a typographical error, given that all other IQ scores in the same report fall within the 60-70 range of "mild" retardation.  However, even if the numeric value was accurately typed, the undersigned finds no error in the ALJ's conclusion that the score cannot be considered valid.

Plaintiff's effort and motivation must have been poor.  (Tr. 482).  In addition, Plaintiff's lengthy job history (which included two semi-skilled positions) was inconsistent with disabling mental retardation. (*Id*). Another reviewing psychologist agreed that Plaintiff had borderline intellectual functioning, not mental retardation.  (Tr. 519).

Plaintiff now argues that the ALJ should have employed a medical expert to evaluate his recent low IQ score.  For the first time, Plaintiff also challenges the validity of his earlier IQ score of 78, suggesting that it should have been calculated as a "71." (Doc. 11 at 4).   Of course, a "71" still would be outside the range required to meet any Listing under 12.05.

An ALJ has a duty "to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 111 (2000)(citation omitted).   However, ordinarily an ALJ "has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001)(citing 20 C.F.R. §404.1517).  "The duty to develop the record...is balanced with the fact that '[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant.'" *Landsaw v. Sec'y of Health & Human Servs.*, 803 F2d 211, 213 (6th Cir. 1986)(citing 20 C.F.R. §§416.912, 416.913(d)); *see also Her v. Com'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999)(claimant's burden to prove disability).

Plaintiff did not previously request additional development of the record concerning the perceived discrepancy in IQ scores.  As discussed below, the ALJ's determination that sufficient evidence existed to determine that Plaintiff did not meet or

equal Listing 12.05 is well supported. Therefore, the ALJ did not abuse his discretion in failing to develop the record further.

Many people with an IQ score lower than 70 remain capable of full-time work and therefore do not meet the Listing. *See Thomas v. Com'r of Soc. Sec.*, 2010 WL 1254788 *8 (N.D. Ohio, March 24, 2010) (recognizing that "many, if not most, mildly mentally retarded individuals will be able to work," quoting *Muntzert v. Astrue*, 502 F. Supp.2d 1148, 1157-58 (D. Kan. 2007)). At this judicial review stage, Plaintiff's burden is "much higher" to the extent that Plaintiff must show that the nondisability finding the ALJ made is not supported by substantial evidence. *Carter v. Com'r of Soc. Sec.*, 2012 WL 1028105 at *6 (W.D. Mich., March 26, 2012). Plaintiff cannot meet that burden of proof.

To meet any portion of Listing 12.05, Plaintiff was required to show that he had "significantly sub-average general intellectual functioning that manifested before the developmental period," including but not limited to "deficits in adaptive behavior." Plaintiff must show both current deficits and that significant deficits manifested themselves prior to age 22. Here, three separate psychologists agreed that Plaintiff's adaptive functioning was consistent with borderline intellectual functioning, while no medical source suggested that Plaintiff had mental retardation. While Listing 12.05 (which bears the heading: "Mental retardation") does not require a formal *diagnosis* of mental retardation, many courts have considered the lack of any such diagnosis as one of several factors relevant to the determination of whether a claimant meets or equals the Listing. *See, e.g., Hayes v. Com'r of Soc. Sec.*, 357 Fed. Appx. 672, 676 (6th Cir., Dec. 18, 2009)(noting that no school records, and no therapist or psychologists, had

ever mentioned mental retardation or intellectual deficiencies); *cf. Cooper v. Com'r of Soc. Sec.*, 217 Fed. Appx. 450, 452 (6th Cir. 2007).

In addition to evidence that undermines the validity of Plaintiff's single low IQ score, the Commissioner's decision is strongly supported by nearly all evidence concerning Plaintiff's level of adaptive functioning. "Adaptive" functioning differs from "academic" functioning, and includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills." *West v. Com'r of Soc. Sec.*, 240 Fed. Appx. 692, 698 (6th Cir. 2007)(citing *Heller v. Doe by Doe*, 509 U.S. 312, 329 (1993) and holding that plaintiff who held a long-term, full-time job, with many activities of daily living, did not show deficiencies in adaptive functioning). "The American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments...in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Hayes v. Com'r of Soc. Sec.*, 357 Fed. Appx. at 677. Here, Plaintiff's social history (married and in the process of adopting a seven-year-old child), lengthy work history (including two semi-skilled jobs), and testimony concerning his daily activities (drives, visits with friends, shops for junk food, and has no difficulties with personal grooming) all severely undermine Plaintiff's contention that he meets or equals Listing 12.05.

Plaintiff points to evidence that he was in special education classes, and was held back twice in school. Before this Court,[4] he also notes that early in his work life, his employment was less solid; he was employed only part-time prior to the age of 22,

---

[4]Conversely, at the evidentiary hearing, Plaintiff's counsel highlighted Plaintiff's extensive work history in support of his claim. "[H]e earned two quarters of coverage at age 17 while still in high school." (Tr. 33, see also Tr. 32 "this is a chronic pain case.").

and he was unemployed for a full year when he was 25. None of this evidence is sufficient to show the required deficits, however, when the entirety of the record is considered.

Certainly not every person placed in special education classes suffers from mental retardation. The Sixth Circuit "has never held that poor academic performance, in and of itself, is sufficient to warrant a finding of onset of subaverage intellectual functioning before age twenty-two." *Hayes*, 357 Fed. Appx. at 676 (citing *Foster*, 279 F.3d at 355). Plaintiff criticizes the ALJ for referring to Plaintiff as a "high school graduate…with no reference to his reading skills [or] mathematics skills." (Doc. 11 at 12). However, Plaintiff testified that despite difficulties, he graduated from high school. (Tr. 35). Other evidence indicated that Plaintiff was "good at math," (Tr. 155).

Similarly, Plaintiff's employment history does not support a finding of mental retardation. Many youth are underemployed. Plaintiff's long and stable work history beyond his earliest years in the labor force refutes any contention that adaptive deficits caused his early under-employment. *Accord, Cooper*, 217 Fed. Appx. at 452; *Hayes*, 357 Fed. Appx. at 676. There is no evidence that Plaintiff cannot work because of his IQ. Although he testified that he once gave up a supervisory position that involved too much paperwork, Plaintiff otherwise appears to have had no problems performing any job based upon his alleged mental deficits.

Case law involving similar facts strongly supports the ALJ's Step 3 analysis. *See e.g.*, *Foster*, 279 F.3d 348 (affirming non-disability finding based on lack of adaptive functioning, noting strong work history despite evidence that claimant had dropped out after ninth grade and was in special education classes, had tried four times without success to earn her GED, and had arguably qualifying IQ scores); *West*, 240 Fed.

Appx. at 698 (affirming denial of listing where claimant with low IQ scores had diagnosis of borderline intellectual functioning, and evidence did not show deficiencies in adaptive functioning).

Of course, cases can be found that differ in outcome. In his reply memorandum, Plaintiff cites *Brown v. Sec'y of Health and Human Servs.*, 948 F.2d 268 (6th Cir. 1991). The fact that substantial evidence may exist to support a contrary conclusion does not mean that this Court must reverse. Moreover, *Brown* is distinguishable both on its facts, and because it preceded the seminal Sixth Circuit decisions emphasizing the need to show deficits in adaptive functioning. *See, e.g., Foster, supra*; s*ee also Courter v. Com'r of Soc. Sec.*, 2012 WL 1592750 *7 (6th Cir., May 7, 2012)(competing evidence of mental retardation under Listing 12.05B not sufficient to overturn decision, when substantial evidence supports contrary conclusion or the claimant's allegations are deemed not credible).

In his reply memorandum, Plaintiff presents a new argument that because his other physical impairments limited him to light work, he should have been considered to meet the criteria of 12.05C. However, the ALJ reasonably determined that Plaintiff did not have adaptive deficits sufficient to show any form of mental retardation.

### 3. Listing 12.02(A)

Plaintiff additionally argues that the ALJ failed to consider Listing 12.02(A)(7) even though "this was specifically brought to his attention." (Doc. 11 at 7, citing Tr. 33). The undersigned agrees that, because Plaintiff explicitly raised the argument that he met or equaled Listing 12.02(A)(7), the ALJ should have addressed that argument. Beyond that minimal agreement, however, the undersigned finds no basis for reversal.

Listing 12.02 states:

14

> Organic Mental Disorders: Psychological or behavioral abnormalities associated with a dysfunction of the brain.   History and physical examination or laboratory tests demonstrate the presence of the specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.   The required level of severity…is met when requirements in both A and B are satisfied, or when the requirements of C are satisfied.
>
> A.        Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:
>           1.  Disorientation to time and place; or
>           2.  Memory impairment…; or
>
>           7. Loss of measured intellectual ability of at least 15 IQ points from premorbid levels….

20 C.F.R. Part 404, Appx 1 to Supbt P, §12.02.  Although counsel professed ignorance of the cause for the alleged drop at the hearing, he now asserts that the "organic basis for the drop in IQ would be chronic pain, hypertension, sleep apneas, and the side effects of the medication."  (Doc. 11 at 8).

In addition to the medical findings in Paragraph A, Listing 12.02 requires that a claimant show either "marked restriction" in one of the four functional areas known as the "Paragraph B" criteria, or else "Paragraph C" criteria of:

> A medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support and one of the following:
>
> 1.  Repeated episodes of decompensation, each of extended duration; or
>
> 2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement….

Listing 12.02.

As discussed above, the evidence of the alleged IQ "loss" is weak, and substantial evidence supports the ALJ's determination that the single score of 58 does not reflect Plaintiff's functional abilities.[5]  Even if the alleged "drop" in IQ score were valid, Plaintiff fails to offer any evidence whatsoever to satisfy either the essential "B" or "C" criteria of Listing 12.02.  No physician or medical source has ever opined that Plaintiff has any type of "organic" mental disorder.  Dr. Waggoner expressly declined to consider Listing 12.02 as relevant.  (Tr. 465-466).  And as previously discussed, there is no evidence of a "marked" impairment in any functional area, and no evidence of any episodes of decompensation of "extended duration," or evidence of a "chronic organic mental disorder of at least 2 years' duration."  Dr. Waggoner expressly opined that Plaintiff did not meet the latter "C" criteria.  (Tr. 476).

Newly presented arguments, that Plaintiff satisfies some other portion of Listing 12.02(A), based upon his alleged disorientation to time and place (Listing 12.02(A)(1)), or memory impairment (Listing 12.02(A)(2)), are equally unpersuasive because they do not change the fact that Plaintiff does not meet either the "B" or "C" criteria.  Plaintiff also points to his wife's testimony that he was disoriented.  However, in response to a question from Plaintiff's counsel as to whether Plaintiff's behavior, attention, concentration had "gotten worse since he started taking significantly more [pain medications], Plaintiff's wife responded "not so much worse.  I mean, it's – he's *always been pretty much like this*."  (Tr. 60, emphasis added).  Her testimony of a gradual decline does not support Plaintiff's claim of a significant organic decline.

---

[5]Plaintiff's argument under Listing 12.05 that the "78" should have been assessed at a "71" contradicts his argument that he has suffered more than a 15 point drop under Listing 12.02.

### 4. Consideration of Pain Medications

The regulatory framework requires the Commissioner to consider the "type, dosage, effectiveness, and side effects of any medications the individual takes…" *See* 20 C.F.R. §404.1529; Soc. Sec. Rule 96-7p.  Plaintiff's third and fourth claims argue that the ALJ failed to assess the impact of Plaintiff's prescribed pain medications, both in determining Plaintiff's credibility, and in relying upon consulting physician opinions.

### a. Alleged Side Effects from Pain Medications and Credibility Issue

Plaintiff has been on narcotic pain medications for chronic back and/or neck pain for more than a decade, spanning many years of full-time employment. (Tr. 431, 2003 record; Tr. 677, 2011 record reporting oxycontin use "for 10 years").  At one point he was being followed for a thoracic syrinx, but after several years of MRI monitoring, that condition was determined not to be causing any significant problem.  (Tr. 417, 421).  In 2007, he had a "fairly large disc extrusion at L4-L5," that was treated successfully with injections. (Tr. 415, *compare* Tr. 427).  Follow-up images confirmed that the extrusion completely resolved. (Tr. 415, 546). Nevertheless, and despite negative physical, neurological, and radiological findings, Plaintiff continued to complain of "chronic low back pain," for which no surgery was ever recommended, but for which a "combined weight loss and exercise regimen" was repeatedly recommended.  (Tr. 415-417, *see also* Tr. 685, "Normal study… "No evidence of cervical problem or even arthritis. Cannot explain pt's neck pain that he states is so severe.").  Plaintiff was not compliant with that advice.  (Tr. 514).

Dr. Walker, Plaintiff's primary care physician, eventually referred Plaintiff to Dr. Temponeres, a pain specialist. (Tr. 40).  Plaintiff quit seeing Dr. Temponeras after she was "shut down" by federal agents.  (Tr. 19, 54).  Despite "normal" physical findings on

examination and reports of "0" on a pain scale, Dr. Temponeres prescribed Plaintiff an unusually extensive list of narcotics and opioid medications, which she dispensed and sold directly through her pain clinic. (Tr. 43, 522, 525). While the records varied over time, Plaintiff points to a 2011 record as evidence that Plaintiff was simultaneously prescribed 150 hydrocodone 10 (325 tablets), 90 800 mg Neurontin tablets, 90 15 mg. oxycodone tablets, 90 330 mg oxycodone tablets, 150 10-325 Percocet tablets, 90 2 mg Xanax tablets, 60 25 mg phenogram tablets (to combat nausea from opiates) per month, plus a TENS unit for his chronic pain. (*See also* Tr. 551, 2010 record reflecting differing amounts of Neurontin, Oxycodone, Oxycontin, and Xanax). Dr. Temponeres advised Plaintiff "to take it easy and don't lift more than about 15-20 pounds." (Tr. 42).

Contrary to Plaintiff's assertion the ALJ "never discussed" side effects, the ALJ noted that Plaintiff reported side effects such as drowsiness and fatigue (Tr. 16). However, the ALJ also concluded that Plaintiff's allegations were not entirely credible. (Tr. 21). The ALJ cited to Plaintiff's non-compliance with treatment and to his reported daily activities in making that credibility assessment.

"[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* at 476. (citations omitted). An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there

are contradictions among the medical records, his testimony, and other evidence. *Warner v. Com'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004).

The record concerning side effects from Plaintiff's pain medications is equivocal, at best. At the hearing, Plaintiff testified that he gets sleepy "when I take my Xanaxes" but just as clearly testified that he has **no** side effects at all. (Tr. 44). Clinical records document that Plaintiff consistently denied experiencing side effects. (*See e.g.*, Tr. 151, 177, 186). Plaintiff denied excessive fatigue during the application process in June 2008, (Tr. 224), and again in April 2011. (Tr. 624). In fact, there is no evidence that Plaintiff ever reported side effects to his physician, which casts doubt on the credibility of Plaintiff's more recent assertions of severe side effects. *See Essary v. Com'r of Soc.. Sec.*, 114 Fed. Appx. 662, 665 (6th Cir. 2004). Plaintiff contends that given a recent hospitalization, with its suspected diagnosis of "opiate induced psychological disorder," the ALJ's failure to further discuss the side effects of his medications provides grounds for remand. (*See* Tr. 622). However, that single record does not evidence ongoing side effects. Plaintiff's wife testified that Plaintiff's behavior, attention, and concentration had not significantly declined since he began taking more pain medications, and that the "gradual[]" changes that she had observed could not be attributed to his pain medications. "I don't think it's from, you know, all the pain medicine, because like, right now, he hasn't taken anything and he's still like that." (Tr. 60).

In terms of the ALJ's adverse credibility assessment, Plaintiff further argues that there is no evidence that he personally engaged in illegal activity by obtaining prescriptions from the now-closed pain clinic. Plaintiff argues that because he has a low IQ "somewhere between 78 and 58," he should not have been expected to understand or held accountable for the fact that he was being overprescribed. (Doc. 11 at 11 "Was

Mr. Webb able to determine he was receiving incredibly incompetent care any sooner than the federal authorities?"). However, several treating physicians questioned the amount of pain medications that Plaintiff was taking, and counseled him against continuing that long-term regimen, advising him instead to lose weight and start exercising.   I find no error in the ALJ's credibility assessment.   The ALJ clearly considered the record as a whole, including the evidence of Plaintiff's medication use, his ability to work for many years while taking similar medications, his non-compliance with advice to diet and exercise, and conflicting testimony concerning the alleged side effects of his medications and other testimony. (*See also* Tr. 514, noting inconsistency between Plaintiff's report that he'd been unable to work for years due to back pain and evidence that he'd recently been laid off).

### b.   Acceptance of Consulting Physician Opinions

Loosely included within his pain medication claim, Plaintiff also criticizes the ALJ for adopting the opinions of consulting physicians over the opinion of Dr. Temponeres. He does not directly invoke the treating physician rule. (See Doc. 11 at 10-11).[6] Instead, he argues that the non-examining consultants did not have access to the treatment records of Dr. Temponeras, which included Plaintiff's medication list and her opinion that Plaintiff is disabled from all work.  However, I find no error either in the rejection of Dr. Temponeres's wholly unsupported disability opinion or in the adoption of the consultants' opinions.[7]  (*See* Tr. 551, July 2010 letter). As the ALJ stated, Dr. Temponeras's opinion was inconsistent with the record as a whole, was not supported

---

[6]That regulatory rule generally requires the Commissioner to give "controlling weight" to the opinion of a treating physician that is well-supported, and that is not contradicted by the record as a whole.  Dr. Temponares's opinion met neither of those criteria.
[7]Plaintiff undercuts his argument by describing Dr. Temponeras's care in another section of his brief as "incredibly incompetent."

by objective findings, and concerned an issue reserved to the Commissioner.  (Tr. 19). Dr. Fulton, Plaintiff's treating neurologist, issued a letter stating that Plaintiff should not be on any chronic narcotics, (Tr. 380), an opinion shared by other physicians.  (Tr. 622 (ER physician); Tr. 652, "strongly advise tapering him down on his pain medications"; Tr. 663).

An ALJ may adopt the opinion of a consulting physician who does not have access to a complete record so long as the ALJ acknowledges that fact and explains the basis for his reasoning.  Here, the ALJ expressly considered the evidence received after the state agency consultants rendered their opinions, but explained that the later-filed evidence did not indicate any significant decline in Plaintiff's condition and therefore did not alter his adoption of the earlier opinions. (Tr. 21).  The records before the consulting physicians reflected Plaintiff's narcotic use for more than a decade, as well as a fairly extensive list of medications dated just prior to his alleged disability onset date in August 2009. (Tr. 494).  Even though most consultants did not have access to the 2011 list of medications,[8] considering that the unreviewed records were from the unreliable Dr. Temponeras, it is difficult to imagine that the state agency consultants would have changed their opinions. *See also generally Kelly v. Com'r of Soc. Sec.*, 314 Fed. Appx. 827, 831 (6th Cir. 2009)("There will always be a gap between the time the agency experts review the record and give their opinion…and the time the hearing decision is issued.  Absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand.").

---

[8]Dr. Swedberg reviewed Plaintiff's medications but Plaintiff complains he did not "indicate the dosage." (Doc. 11 at 13).

### 5.  Consideration of Plaintiff's Combination of Impairments

Plaintiff also argues that the ALJ erred by failing to discuss the combination of impairments caused by medication side effects, neuropathy in his lower extremities, lack of range of motion, sleep apnea, and hypertension.  "Nowhere in the opinion is there any discussion as to why these demonstrated limitations are non-severe."  Plaintiff calls this a "step two" error requiring remand.  Plaintiff's argument itself is somewhat cursory; he does not explain in what way they more severely contributed to his work limitations.  Contrary to Plaintiff's argument, Dr. Swedberg concluded that Plaintiff did not have neuropathy in his lower extremities.  Regardless, the ALJ acknowledged that Plaintiff had been diagnosed with diabetic neuropathy (Tr. 18), but found no limitations associated with that condition.  (Tr. 21).

A failure to classify any particular impairment as "severe" at Step 2 will not amount to error requiring reversal, so long as the ALJ found the existence of some severe impairments and proceeded to the next step of the analysis.  *See Walton v. Astrue*, 773 F. Supp.2d 742, 747 (N.D. Ohio, 2011)(citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).  In this case, the ALJ's determination that Plaintiff suffered from other severe impairments renders any alleged "Step 2" error harmless.

To the extent considered under Step 4, Plaintiff fails to demonstrate reversible error except for the previously discussed "concentration, persistence, and pace" limitation.  For example, the ALJ did not ignore Plaintiff's sleep apnea, which – contrary to Plaintiff's argument – he found to be "severe."  (Tr. 13).  He specifically discussed the evidence concerning that impairment before concluding that it was not disabling.  (Tr. 19 citing Tr. 651-53).

### 6.  Failure to Adequately Address Obesity

In his last claim, Plaintiff argues that the ALJ paid only "lip service" to the requirement that obesity be considered.  (Doc. 11 at 17).  The ALJ found that Plaintiff was obese, with a height of 6 feet 3 inches and a weight of 300 pounds, and that it was a "severe" impairment. (Tr. 14, 20).  The ALJ also noted medical records in which Plaintiff's treating sources had diagnosed him with morbid obesity (Tr. 20).  Consulting physician Dr. Swedberg opined that Plaintiff's obesity would negatively impact Plaintiff's functional abilities, as did consultant Dr. Manos. (Tr. 463-464. 512).  However, the ALJ explained why Plaintiff retained the ability to perform light work notwithstanding his obesity.  The ALJ stated that his RFC was consistent with Dr. Swedberg's opinions, which limited Plaintiff to a "mild to moderate" amount of various postural activities.  (Tr. 18).  The ALJ's analysis was adequate, and finds substantial support in the record.  *See Bledsoe v. Barnhart*, 2006 WL 229795 at *4 (6th Cir. 2006)(holding that ALJ did not error when he credited an expert report that explicitly considered the claimant's obesity).

### III.  Conclusion and Recommendation

For the reasons discussed herein, **IT IS RECOMMENDED THAT** Defendant's decision be **REVERSED and REMANDED** under Sentence Four solely for consideration of Plaintiff's limitations in concentration, persistence and pace, and that this case be **CLOSED.**


                                                      */s Stephanie K. Bowman*
                                                      Stephanie K. Bowman
                                                      United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

KENNETH WEBB,                                      Case No. 1:12-cv-984

        Plaintiff,                                 Weber, J.
                                                   Bowman, M.J.
   v.


COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).